880 A.2d 578

COMMONWEALTH of Pennsylvania, Appellee

v.

Gary BEAMAN, Appellant.

Supreme Court of Pennsylvania.

Argued March 7, 2005.

Decided Aug. 15, 2005.

Kevin McNicholas, for Gary Beaman.

David R. Crowley, Bellefonte, for Pennsylvania Association of Criminal Defense Lawyers.

Michael Wayne Streily, Pittsburgh, for Commonwealth of Pennsylvania.

Before: CAPPY, C.J., NIGRO, NEWMAN, SAYLOR, EAKIN, BAER, JJ.

## OPINION

Justice SAYLOR.

This appeal involves a facial constitutional challenge to the validity of police sobriety checkpoints. The primary question for resolution centers on whether roving police patrols are more efficient at identifying and apprehending drunk drivers, and, if so, whether this fatally undermines the constitutional validity of checkpoints due to the suspicionless stops that they entail.

On June 9, 2001, the Pittsburgh City Police Department conducted a sobriety checkpoint on Saw Mill Run Boulevard.[1]

---

1. In this Opinion, the terms "DUI roadblock" and "sobriety checkpoint" are used interchangeably. Both terms indicate a well-marked, stationary roadblock conducted by the police for several hours at a

Appellant was stopped at this checkpoint and was subsequently charged by information with two counts of driving under the influence of alcohol ("DUI"). *See* 75 Pa.C.S. § 3731.[2] Appellant filed an omnibus pretrial motion, followed by a supplemental omnibus pretrial motion, in which he requested suppression of all evidence obtained by the Commonwealth, claiming that sobriety checkpoints are *per se* violative of the Pennsylvania Constitution. In this regard, Appellant contended that, "unless and until the Commonwealth establishes that checkpoints more efficiently satisfy the Commonwealth's compelling interest in preventing drunk driving than less intrusive law enforcement measures," any use of such checkpoints violates constitutional protections against unreasonable searches and seizures. As an alternate basis for suppression, Appellant asserted that the checkpoint at which he was stopped failed to adhere to the guidelines established by this Court in *Commonwealth v. Tarbert,* 517 Pa. 277, 535 A.2d 1035 (1987), and *Commonwealth v. Blouse,* 531 Pa. 167, 611 A.2d 1177 (1992), which were designed to provide adequate notice of such roadblocks and minimize their intrusion upon the privacy of drivers.

The trial court held a bifurcated hearing on the motion on September 30, 2002, and January 21, 2003. The first proceeding focused upon whether DUI checkpoints are unconstitutional *per se* in light of Appellant's empirical evidence concerning their effectiveness in removing drunk drivers from the road-

time. The officers on the scene make brief, suspicionless stops to check for driver intoxication, using a predetermined objective standard in determining which cars to stop. Such roadblocks are advertised in advance and are situated at roadway locations where drunk driving is known to have occurred in the past. *See generally Commonwealth v. Tarbert,* 517 Pa. 277, 289–90, 535 A.2d 1035, 1041 (Pa.1987) (describing sobriety checkpoints in more detail).

**2.** Section 3731 was subsequently repealed and reenacted as amended at Section 3802 of the Vehicle Code, 75 Pa.C.S. § 3802. *See* Act of September 30, 2003, P.L. 120, No. 24, §§ 14, 16. Appellant was charged under Section 3731(a)(1), which prohibited driving while under the influence to a degree which renders the person incapable of safe driving, as well as Section 3731(a)(4), which prohibited driving with a blood-alcohol content of 0.1%.

ways, as compared to roving DUI patrols.[3] In particular, Appellant presented the testimony of Louis Rader, the manager of highway safety for the Pennsylvania Department of Transportation ("PennDOT"). Mr. Rader testified that, based upon statistics available for several Pennsylvania counties during the years 1999–2001, approximately 0.71 percent of all drivers stopped at sobriety checkpoints were charged with DUI; he noted additionally that this is relatively close to the national average of 1.0 percent. Furthermore, Mr. Rader confirmed that, during the 1999–2001 period, the total number of law enforcement manpower-hours expended per DUI arrest at sobriety checkpoints was 22.84, and the total number of manpower-hours per arrest—including both law enforcement and administrative personnel—was 28.77.[4] By comparison, 18.82 manpower-hours were required for each DUI arrest stemming from a roving patrol, and 7.69 percent of all drivers stopped by such patrols were charged with DUI.

At the conclusion of the hearing, the trial court ruled from the bench, stating that, although roving DUI patrols may result in a higher number of arrests per manpower-hour, the evidence presented was insufficient to demonstrate that this discrepancy rendered DUI roadblocks *per se* unconstitutional. In this respect, the court reasoned that both methods constitute valuable police techniques to curtail drunk driving, and that no constitutional infirmity could be gleaned solely from the statistical evidence presented. *See id.* at 52–53. The court additionally drew an analogy to police drug enforcement activities, and stated that, although purchasing drugs from a drug dealer may be "more efficient timewise" than conducting

3. A roving DUI patrol occurs when police officers patrol roadways during specific hours of the evening to detect impaired driving and make stops when necessary. The officers involved in a roving patrol only stop a vehicle if they have probable cause to believe that a moving violation has occurred. *See* N.T. 9/30/02 at 10–11.

4. This total manpower-hours figure includes the time spent by police personnel and non-police personnel (e.g., emergency and fire department personnel) at roadblocks, as well as the effort expended in planning, setting up, and dismantling the roadblocks.

outside surveillance, "that does not make one unconstitutional and the other one constitutional." *Id.* at 53.[5]

On February 10, 2003, Appellant was convicted of both counts of DUI after a non-jury trial; he was sentenced to spend 48 hours in jail and pay a $300 fine. A three-judge panel of the Superior Court affirmed the judgment of sentence in a published opinion, *see Commonwealth v. Beaman,* 846 A.2d 764 (Pa.Super.2004), rejecting, *inter alia,* Appellant's contention that the trial court erred in failing to find that he had proved DUI roadblocks to be unconstitutional *per se. See id.* at 768–70. We granted allocatur to review the trial court's determination in this regard.

[1–3] In reviewing a ruling denying a motion to suppress, this Court considers only the evidence of the prosecution's witnesses and so much of the defense evidence as remains uncontradicted. *See Commonwealth v. Watkins,* 577 Pa. 194, 210, 843 A.2d 1203, 1212 (2003). We will affirm the suppression court's decision where its factual findings are supported by the record and the inferences and legal conclusions drawn from them are legitimate. *See Commonwealth v. Hughes,* 521 Pa. 423, 438, 555 A.2d 1264, 1271–72 (1989). The sole proceeding under review here is the first half of the bifurcated suppression hearing. At that hearing, there were no prosecution witnesses, and the testimony of Appellant's sole witness, as well as his statistical exhibits, remained uncontradicted. Thus, the question for this Court resolves to whether the trial court properly concluded that such evidence was insufficient to demonstrate that roadblocks are *per se* unconstitutional. To the extent this question involves issues of law, our review is *de*

5. The January 21, 2003, proceeding pertained to Appellant's claim that suppression should be granted because the checkpoint at which he was apprehended did not conform to the *Tarbert/Blouse* guidelines. At that hearing, the Commonwealth—which bore the burden to prove that Appellant's rights were not violated, *see* Pa.R.Crim.P. 581(H); *Commonwealth v. Gordon,* 546 Pa. 65, 71 n. 7, 683 A.2d 253, 256 n. 7 (1996)—presented the testimony of the officer who supervised the checkpoint. Based upon his testimony, the court again ruled from the bench and denied suppression, finding that the checkpoint satisfied all applicable legal requirements. *See* N.T. 1/21/03 at 36–37. Appellant does not presently challenge this aspect of the trial court's ruling.

*novo. See Chester Water Auth. v. Pennsylvania Public Util. Comm'n,* 581 Pa. 640, 648 n. 9, 868 A.2d 384, 389 n. 9 (2005).

Initially, we note that the stopping of an automobile at a checkpoint constitutes a seizure for constitutional purposes, thus implicating the protections of both the Fourth Amendment to the United State Constitution, *see Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990), and Article I, Section 8 of the Pennsylvania Constitution, *see Blouse,* 531 Pa. at 169, 611 A.2d at 1178. These provisions do not proscribe all searches and seizures, but only "unreasonable" ones.[6] Thus, the central question in any litigation challenging a particular search or seizure is whether that search or seizure was constitutionally "reasonable." *See Sitz,* 496 U.S. at 450, 110 S.Ct. at 2485; *Blouse,* 531 Pa. at 169, 611 A.2d at 1178.

The reasonableness of a seizure that is less intrusive than a traditional arrest depends upon a three-pronged balancing test derived from *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), in which the reviewing Court weighs "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* at 50, 99 S.Ct. at 2640. To be deemed reasonable under this standard, such a seizure must ordinarily be supported by reasonable suspicion, based upon objective facts, that the individual is involved in criminal activity. *See id.* at 51, 99 S.Ct. at 2641; *see also City of Indianapolis v. Edmond,* 531 U.S. 32, 37, 121 S.Ct. 447, 451, 148 L.Ed.2d 333 (2000); *Chandler v. Miller,* 520 U.S. 305, 308, 117 S.Ct. 1295, 1298, 137 L.Ed.2d 513 (1997). *See generally Terry v. Ohio,* 392 U.S. 1, 21 & n. 18, 88 S.Ct. 1868, 1880 & n. 18, 20 L.Ed.2d 889 (1968) (emphasizing the centrality of the individualized suspicion

6. The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Similarly, Article I, Section 8 of the Pennsylvania Constitution states that "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures...." PA. CONST. art. I, § 8.

requirement to the Supreme Court's Fourth Amendment jurisprudence). The existence of individual suspicion, however, is not an "irreducible" component of reasonableness in every circumstance. Rather, where regimes of suspicionless searches or seizures are designed to serve governmental "special needs" that exceed the normal demands of law enforcement, they will be upheld in certain instances.[7]

7. *See, e.g., Board of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls,* 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (random drug testing of extracurricular participants and student drivers); *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (random drug testing of student-athletes); *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 677, 109 S.Ct. 1384, 1397, 103 L.Ed.2d 685 (1989) (random drug-testing of customs officials carrying firearms or involved in drug interdiction activities); *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 633–34, 109 S.Ct. 1402, 1422, 103 L.Ed.2d 639 (1989) (random drug testing of private railway employees pursuant to federal regulations); *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (brief, suspicionless seizures of motorists at fixed checkpoints near the Mexican border to intercept illegal aliens); *Blouse,* 531 Pa. at 171, 611 A.2d at 1179 (suspicionless vehicle stops at fixed checkpoints to detect and remove unlicensed drivers and dangerous automobiles from the road); *In re F.B.,* 555 Pa. 661, 673, 726 A.2d 361, 368 (1999) (suspicionless point-of-entry search for weapons at public school); *Commonwealth v. Cass,* 551 Pa. 25, 32, 709 A.2d 350, 365 (1998) (suspicionless canine-sniff drug search of student lockers at public school); *see also Illinois v. Lidster,* 540 U.S. 419, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004) (upholding suspicionless roadway checkpoint stops to obtain information concerning a recent hit-and-run accident; the purpose of the stops was to solicit citizen help in solving a crime, not to detect criminal activity on the part of the drivers). *But see Edmond,* 531 U.S. at 41–42, 121 S.Ct. at 454 (invalidating drug-interdiction roadway checkpoint as its purpose was to detect evidence of ordinary criminal wrongdoing not specifically connected with highway safety); *Chandler v. Miller,* 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) (invalidating a Georgia statute requiring all candidates for high office to submit to a drug test, as the underlying governmental need was "symbolic" rather than "special"); *United States v. Brignoni–Ponce,* 422 U.S. 873, 883, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975) (disallowing random, suspicionless roving-patrol stops to intercept illegal aliens); *Theodore v. Delaware Valley Sch. Dist.,* 575 Pa. 321, 347, 836 A.2d 76, 91 (2003) (departing from *Earls* and invalidating, under the state Constitution, the random drug testing of extracurricular participants and student drivers, where the record contained no evidence that a drug problem existed at the school or that the targeted group was particularly prone to drug use). The Supreme Court has also allowed suspicionless searches for certain administrative purposes. *E.g., New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 96

Because of the severe consequences of drunken driving in terms of roadway deaths, injuries, and property damage, *see generally Sitz,* 496 U.S. at 451, 110 S.Ct. at 2485–86 (summarizing national statistics); *Tarbert,* 517 Pa. at 291, 535 A.2d at 1042 (summarizing Pennsylvania statistics), both the United States Supreme Court and this Court have recognized that the government has a compelling interest in detecting intoxicated drivers and removing them from the roads before they cause injury. *See Sitz,* 496 U.S. at 451, 110 S.Ct. at 2485–86; *Commonwealth v. Yastrop,* 564 Pa. 338, 345–46, 768 A.2d 318, 322–23 (2001) (plurality opinion); *Tarbert,* 517 Pa. at 291, 535 A.2d at 1042 (plurality opinion); *cf. Blouse,* 531 Pa. at 172, 611 A.2d at 1179 (finding that the removal of unsafe vehicles and unlicensed drivers from the roads constitutes a "vital interest" grounded in the need for roadway safety). This has raised the question of whether the law permits police officers to effect suspicionless seizures in the form of brief vehicle stops at publicly announced sobriety checkpoints along roadways known to be frequented by intoxicated drivers. As noted, and as with all similar questions, this question has been answered with reference to the balancing test described above.

As to the Fourth Amendment, the United States Supreme Court has determined that DUI roadblocks constitute a reasonable means of advancing the vital public interest in reducing drunk driving deaths and injuries, and that they only involve a modest intrusion on the privacy and liberty of motorists. Accordingly, the Court has found that suspicionless stops at such roadblocks are constitutionally reasonable. *See Sitz,* 496 U.S. at 451–55, 110 S.Ct. at 2485–88. The question remains, however, whether the greater individual privacy protections afforded by Article I, Section 8 of the Pennsylvania Constitution, *see generally Commonwealth v.*

L.Ed.2d 601 (1987) (warrantless administrative inspection of premises of a closely regulated business); *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (administrative inspection of fire-damaged premises to determine cause of blaze); *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (administrative inspection to ensure compliance with city housing code).

*Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), compel a different result.

In *Tarbert*, this Court disposed of consolidated appeals in which the Superior Court had ordered the suppression of drunk-driving evidence obtained from DUI roadblocks similar to the one under review here. Mr. Chief Justice Nix authored the opinion announcing the judgment of the Court, in which he affirmed the Superior Court's orders on the basis that the authority granted to the police under Section 6308(b) of the Vehicle Code, 75 Pa.C.S. § 6308(b), as it then existed, only authorized vehicle stops premised upon individualized suspicion.[8] *See Tarbert*, 517 Pa. at 295, 535 A.2d at 1044. Prior to passing on the statutory question, however, Chief Justice Nix set forth his view that the Pennsylvania Constitution did not prohibit systematic sobriety checkpoints if conducted within certain parameters.[9] He premised this conclusion on the

---

**8.** At the time of the arrests in *Tarbert*, Section 6308(b) provided:

> **(b) Authority of police officer.**—Whenever a police officer has articulable and reasonable grounds to suspect a violation of this title, he may stop a vehicle, upon request or signal, for the purpose of inspecting the vehicle as to its equipment and operation, or vehicle identification number or engine number, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

That provision was subsequently amended to allow for systematic checkpoints; it now states:

> **(b) Authority of police officer.**—Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S. § 6308(b) (as amended). Appellant does not dispute that the Pittsburgh Police had statutory authority to conduct the sobriety checkpoint on Saw Mill Run Boulevard; his challenge is limited to the state constitutional issue.

**9.** Chief Justice Nix offered the following principles to ensure the constitutionality of a DUI roadblock:

> [T]he conduct of the roadblock itself can be such that it requires only a momentary stop to allow the police to make a brief but trained observation of a vehicle's driver, without entailing any physical

state's grave interest in protecting the safety of its citizens, combined with the apparent ineffectiveness of other means of reducing drunk driving. Only one other Justice (Mr. Justice McDermott) joined the lead opinion. In a concurring opinion, Mr. Justice Papadakos stated that, although he agreed that the roadblocks did not present any constitutional infirmity, the lead opinion should not have reached that issue as the appeals were capable of resolution on purely statutory grounds. *See id.* at 301, 535 A.2d at 1047 (Papadakos, J., concurring). Mr. Justice Larsen dissented and would have reversed the Superior Court's orders, as he found no statutory bar to systematic checkpoints. While he did not expressly reference the constitutional question, it is evident from his dissenting position that he implicitly agreed with Chief Justice Nix's conclusion that the roadblocks were constitutionally valid. *See id.* at 302, 535 A.2d at 1047 (Larsen, J., dissenting); *see also Blouse,* 531 Pa. at 171 n. 2, 611 A.2d at 1179 n. 2 (confirming this interpretation). Thus, "[a]lthough only one justice joined the *Tarbert* opinion in full, . . . of the six who participated, four expressed the view that systematic roadblocks are constitutional." *Blouse,* 531 Pa. at 167, 611 A.2d at 1179.

Five years later, in *Blouse,* the Court relied heavily upon the lead opinion in *Tarbert* to conclude that systematic, non-discriminatory, nonarbitrary roadblocks instituted to detect registration, licensing, and equipment violations are consistent

search of the vehicle or its occupants. To avoid unnecessary surprise to motorists, the existence of a roadblock can be so conducted as to be ascertainable from a reasonable distance or otherwise made knowable in advance. The possibility of arbitrary roadblocks can be significantly curtailed by the institution of certain safeguards. First, the very decision to hold a drunk-driver roadblock, as well as the decision as to its time and place, should be matters reserved for prior administrative approval, thus removing the determination of those matters from the discretion of police officers in the field. In this connection it is essential that the route selected for the roadblock be one which, based on local experience, is likely to be travelled by intoxicated drivers. The time of the roadblock should be governed by the same consideration. Additionally, the question of which vehicles to stop at the roadblock should not be left to the unfettered discretion of police officers at the scene, but instead should be in accordance with objective standards prefixed by administrative decision.
*Tarbert,* 517 Pa. at 293, 535 A.2d at 1043.

with Article I, Section 8 of the Pennsylvania Constitution, so long as they are conducted in conformance with the guidelines announced in *Tarbert*. The *Blouse* court noted that the "status" violations which were the subject of the challenged roadblock were difficult to detect using traditional means. Accordingly, the court approved the use of such roadblocks and expressly adopted the *Tarbert* specifications as applicable to all systematic checkpoints.

More recently, this Court in *Yastrop* was again faced with a DUI roadblock challenge. By this time, there was clear statutory authority for DUI roadblocks. *See supra* note 8. Thus, the question presented was whether, in light of the *Tarbert* dicta, together with the *Blouse* holding relative to status-violation checkpoints, there remained any constitutional barrier to DUI roadblocks under Article I, Section 8. The case again, as in *Tarbert*, produced a two-justice plurality which concluded that no such constitutional proscription exists. The opinion announcing the judgment of the court explained that

[o]ur decision in *Blouse* expressly adopted the *Tarbert* plurality's rationale, along with the guidelines espoused by the plurality. *Blouse*, 611 A.2d at 1179–80 ("In applying *Tarbert* to the case *sub judice*, the rationale behind upholding the constitutionality of drunk driving roadblocks applies equally to all systematic roadblocks"). . . . Thus, in reading *Blouse*, most notably its express adoption of the standards set forth in the Opinion Announcing the Judgment of the Court in *Tarbert*, it is clear that this Court has already concluded that roadblocks like the present one are not *per se* unconstitutional.

*Yastrop*, 564 Pa. at 343–44, 768 A.2d at 321.

As suggested by the above-quoted passage, the lead *Yastrop* opinion, authored by Madame Justice Newman and joined by Mr. Justice Castille, considered it a matter of *stare decisis*—due primarily to *Sitz* and *Blouse*—that sobriety checkpoints are not *per se* unconstitutional under either the state or federal charter. In reaching their conclusion, the lead Justices acknowledged the defendant's argument that allowing suspicionless stops for the purpose of curtailing drunk driving

could lead to a substantial erosion in privacy rights premised on other perceived law enforcement needs, *see id.* at 344–45, 768 A.2d 318, 768 A.2d at 322 (quoting *Pimental v. Department of Transp.*, 561 A.2d 1348, 1353 (R.I.1989)); they were ultimately satisfied, however, that the rights of Pennsylvania citizens would be adequately protected by the distinction between suspicionless stops designed to detect drunk driving (which have been approved), and those intended to ferret out evidence of ordinary criminal activity (which have not). *See id.* at 345–46, 768 A.2d 318, 768 A.2d at 322 (quoting *Edmond,* 531 U.S. at 41–42, 121 S.Ct. at 454). Accordingly, the plurality concluded that systematic, nondiscriminatory, nonarbitrary sobriety checkpoints are not *per se* violative of Article I, Section 8 of the Pennsylvania Constitution, so long as they are conducted in compliance with the standards set forth in *Tarbert* and *Blouse.*[10]

Two Justices concurred separately in *Yastrop* to express their views on the issue of whether roadblock effectiveness could become relevant in a future case where the record did include such proofs. In particular, Mr. Justice Cappy, now Chief Justice, and this author, were uncertain that the rationale employed to support roadblock constitutionality in *Tarbert* and *Blouse* would remain viable in perpetuity in light of possible future developments affecting checkpoint efficiency as compared to other enforcement techniques. Justice Cappy noted that the concept of general suspicionless searches is a constitutional "anomaly," and suggested that proof of more effective suspicion-based means of removing drunk drivers from the roads could eventually undermine the constitutional validity of systematic checkpoints. *See id.* at 350–51, 768 A.2d at 325 (Cappy, J., concurring). Similarly, this author, cross-joined by Justice Castille, expressed the view that, because highway safety and constitutional privacy guarantees represent compelling policy considerations in substantial tension, an inquiry into the actual effectiveness of sobriety checkpoints

10. Although these precepts are referred to as the *Tarbert/Blouse* guidelines, in fact they were set forth in *Tarbert, see supra* note 9, and adopted unchanged in *Blouse.*

may "assume[] a heightened degree of importance" in a future case with a record containing empirical proof along these lines. *See id.* at 351–52, 768 A.2d at 325–26 (Saylor, J., concurring). Notably, as well, Mr. Justice Nigro filed a dissenting opinion, joined by Mr. Justice Zappala (later Chief Justice), opining that DUI roadblocks constitute an inefficient means of apprehending drunk drivers and that, accordingly, the government's interest in conducting them is outweighed by the cumulative intrusion into the privacy of all law-abiding motorists that pass through them. *See id.* at 357–61, 768 A.2d at 328–30 (Nigro, J., dissenting).[11] Therefore, a majority of the Justices were of the view that the efficacy, *vel non,* of sobriety checkpoints in serving the compelling state interest in reducing alcohol-related accidents remained a relevant consideration in assessing the constitutionality of such measures.[12]

We are now presented with an appeal in which the record includes statistical data, as recited above, comparing sobriety checkpoint efficiency with that of roving patrols. Appellant argues that these statistics demonstrate, at the very least, that there exists a practical alternative to DUI roadblocks; he contends that the above three-factor balancing test should not be applied at all because, in his view, the absence of a practical alternative to suspicionless stops constitutes an absolute prerequisite to application of the balancing scheme. *See* Brief for Appellant at 10–16. In this respect, Appellant

11. Mr. Chief Justice Flaherty also authored a dissenting opinion in which he expressed his view that the Pennsylvania Constitution does not permit *any* suspicionless searches or seizures. *See id.* at 353–54, 768 A.2d at 326–27 (Flaherty, C.J., dissenting).

12. This may represent a departure from the Supreme Court's prevailing Fourth Amendment jurisprudence, as reflected in *Sitz.* Although the Court in that decision indicated that, at least nominally, effectiveness is a relevant consideration, it also appeared to reject the position that the effectiveness element could substantially alter a Fourth–Amendment balancing analysis which includes a substantive assessment of the other two prongs (except perhaps in the extreme case where the challenged police tactic was shown to be totally ineffective). *See Sitz,* 496 U.S. at 453–54, 110 S.Ct. at 2487. The potential relevance of this factor under state law stems from the heightened protection provided by the Pennsylvania Constitution. *See generally Theodore,* 575 Pa. at 341–42, 836 A.2d at 88.

distinguishes *United States v. Martinez–Fuerte*, 428 U.S. 543, 557, 96 S.Ct. 3074, 3082–83, 49 L.Ed.2d 1116 (1976), where the Supreme Court upheld illegal-alien checkpoints and noted that a requirement of individualized suspicion would be "impractical" in this context, and *Blouse*, where this Court upheld status-violation checkpoints and suggested that the police would be "incapable of detecting status offenses as opposed to observable offenses" if limited to suspicion-based stops.

As to the Fourth Amendment, Appellant's assertion is not without some foundation in cases that pre-date *Sitz. See, e.g., United States v. Brignoni–Ponce*, 422 U.S. 873, 883, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975) (invalidating suspicionless roving patrol stops to intercept illegal aliens where the nature of smuggling operations tends to generate articulable grounds for identifying violators). However, the Court in *Sitz* expressly refused to consider the presence of practical alternatives as a controlling factor.[13] As for Article I, Section 8, moreover, although *Blouse* did mention the impracticality of requiring probable cause or reasonable suspicion in the context there presented, it never indicated that this was a prerequisite for application of the balancing test in all cases. Indeed, in both *Tarbert* and *Yastrop* it was apparent that the police could have apprehended some drunk drivers by patrolling the roadways in the traditional manner, and yet in each case a majority of Justices were of the view that the compelling governmental interest in protecting the safety of the motoring public ren-

13. The *Sitz* Court rejected the position that the judiciary should ordinarily inquire into the relative effectiveness of reasonable alternative law enforcement techniques. The Court explained that the consideration, in *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), of the "degree to which the seizure advances the public interest"

> was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal. But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.

*Sitz*, 496 U.S. at 453–54, 110 S.Ct. at 2487.

dered the Supreme Court's balancing test appropriate. *Cf. Edmond,* 531 U.S. at 41, 121 S.Ct. at 454 (observing that, in the cases where roadblocks had passed Fourth Amendment scrutiny, the nature of the state's interest—safe roads or patrolling the border—was closely connected with the law enforcement practice used). Thus, as in *Yastrop,* we re-affirm what has already been stated above—that the three-factor balancing articulated by the Supreme Court in cases such as *Sitz* and *Edmond,* and utilized by this Court in *Tarbert* and *Blouse,* constitutes the appropriate means of resolving constitutional challenges to systematic roadway checkpoints; the question then distills to whether Appellant's proof is sufficient to demonstrate that sobriety checkpoints are largely ineffectual, and hence, unconstitutional.

On this record, we are unwilling to draw that conclusion. Although the comparative statistics that Appellant has forwarded show that sobriety checkpoints require more manpower-hours for each DUI arrest than roving patrols, and that a lower percentage of vehicle-stops lead to DUI arrests than with roving patrols, this alone does not mean that they are ineffectual. For one thing, the statistics may be somewhat misleading: because every vehicle that passes through a roadblock is stopped, at least briefly, and a roving patrol only stops an automobile exhibiting signs of impaired driving, it is to be expected that a higher percentage of stopped vehicles will lead to arrests in the roving patrol scenario. The more revealing statistic is that which compares the number of manpower-hours required to make an arrest. Here, we note that the data proffered by Appellant show that approximately 21 percent more law enforcement manpower-hours are needed to make one DUI arrest at a checkpoint than during a roving patrol. Additionally, when the administrative and other non-law-enforcement personnel are factored in, approximately 53 percent more total manpower-hours are required.

Facially, these statistics appear to indicate that, in some sense, roving patrols are more efficient than stationary checkpoints. We are reluctant, however, to base a determination of constitutional validity on the specific discrepancy brought into

view here. First, the statistical difference in efficiency, measured in this way, is not overwhelming. In this respect, we find considerable force in the *Sitz* Court's suggestion, *see supra* note 13, that the judiciary is in poor position to make judgments concerning the most effective among multiple reasonable police alternatives, particularly when it is the police, and not the courts, that are charged with day-to-day street level law enforcement, and their managers are politically accountable for such decisions in a way that judges are not.[14]

Additionally, focusing solely on the number of manpower-hours or arrests per stop does not tell the whole story. On cross-examination by the prosecutor, Appellant's sole witness at the suppression hearing—Mr. Rader of PennDOT—testified that sobriety checkpoints are also likely to reduce drunk driving through deterrence:

> There is an extreme value in checkpoints. We have found that they provide a significant deterrence effect. The simple fact that law enforcement agencies are required state-wide to advertise sobriety checkpoint[s] a number of weeks in advance is designed to give the motoring public an opportunity to exercise some alternative transportation.

N.T. 9/30/02 at 44. Although Mr. Rader conceded that it is difficult to quantify this deterrence effect, sound reasoning dictates that deterrence is a function of the public perception that the DUI laws are being enforced. Checkpoints are highly visible, and thus, can reasonably be expected to alter an individual's perception of the likelihood of being apprehended if he decides to drive after having consumed alcohol. *See generally Martinez–Fuerte*, 428 U.S. at 557, 96 S.Ct. at 3083 (suggesting that the ability for roadblocks to deter the smuggling of illegal aliens was an important factor in the Court's analysis upholding such procedures); *Blouse*, 531 Pa. at 171,

14. Relatedly, the concept of "efficiency," broadly speaking must incorporate other costs besides manpower-hours. For example, due to their stationary nature, sobriety checkpoints may cost less in terms of fuel and wear-and-tear on police vehicles than roving patrols, and they may result in fewer injuries and less danger to the officers on the scene per arrest. There is no information in the record tending to provide any basis to compare these or other measures of cost as between the two techniques.

611 A.2d at 1179 ("Lastly, the risk of detection, both actual and perceived, will provide an effective deterrent to Motor Vehicle Code violations.").

It is also relevant that Appellant's witness, again on cross-examination, stressed that the effectiveness of sobriety checkpoints—in terms of removing impaired drivers from the road—is not fully captured solely by the number of DUI arrests made. He indicated that it is not uncommon for many vehicles to be removed from the roadway due to some level of impairment short of intoxication, while the driver waits for someone to pick him up or take charge of his vehicle. *See* N.T. 9/30/02 at 45–46. Finally, Mr. Rader observed that sometimes arrests are made (such as for underage drinking) that are not manifested in the statistics pertaining to the number of DUI arrests made as a percentage of cars stopped. *See id.* at 47. In view of these factors, Mr. Rader summarized his understanding of the value of sobriety checkpoints in the following cross-examination colloquy:

Q. Okay. Now, in short, just because DUI checkpoints can be evaluated in terms of man hours and arrest rates and just because roving patrols can be evaluated in terms of man hours and arrest rates, does comparing those two, just because they can be quantified that way, does that make it a valid comparison between the two things?

A. No, I always believed it's apples and oranges. They're two different types of enforcement tools that we employ, and in all of our experience in DUI law enforcement, to take one away puts us at an extreme disadvantage from the standpoint of having the type of impact on the roadways and addressing the problem that we need to have.

Q. Well, why do you say that?

A. Well, literally, if you look at it in terms of a tool box, it's just one less of a valuable tool that we have to get drunk drivers to exercise alternative transportation and to stay off the roadways after they've had something to drink.

*Id.* at 47–48.

Certainly, where the challenged program of suspicionless seizures has no effect, or a *de minimus* effect, in advancing

the public interest at stake, it will be difficult to find such seizures constitutionally reasonable, as the lack of efficacy will cause the scale to tip in favor of the individual. *See Yastrop,* 564 Pa. at 352, 768 A.2d at 325–26 (Saylor, J., concurring).[15] Here, however, based on the record in front of us, we find that the trial court properly concluded that Appellant failed to show that DUI roadblocks are so ineffective that they must be declared constitutionally unreasonable.

Accordingly, the judgment of the Superior Court, affirming the trial court's order, is affirmed.

Justice CASTILLE did not participate in the consideration or decision of this case.

Justice NIGRO files a dissenting opinion in which Justice BAER joins.

Justice NIGRO, Dissenting.

In my dissent in *Commonwealth v. Yastrop,* 564 Pa. 338, 768 A.2d 318 (2001), I took the position that roving police patrols are a much more effective way of catching and deterring drunk drivers than suspicionless DUI checkpoints. As I stated in *Yastrop:*

> ... I believe DUI roadblocks are a waste of limited resources and promote inefficient law enforcement because police officers are forced to spend innumerable hours stopping hundreds of vehicles for a comparatively low number of DUI arrests. It defies common sense to argue that by consolidating police resources on one section of one street, the police can catch more drunk drivers. This logic somehow presumes that drunk drivers will voluntarily line up at pre-determined checkpoints. The more realistic presumption, however, is that an unknown number of drunk drivers who would have easily attracted the attention of trained law

15. Alternatively, one could posit that there will, in fact, be nothing of substance to place on the scale to outweigh the imposition on individual liberty. *Cf. Theodore,* 575 Pa. at 342, 836 A.2d at 88 (suggesting that if government's program is not "efficacious," then its "need" to conduct the challenged search is correspondingly diminished).

officers on routine patrol evade detection simply by using roads other than those targeted for DUI roadblocks.

*Id.* at 328–29.

Of course, this matter provides the record evidence confirming this view. The empirical data before our Court establishes that during the years 1999–2001, only .71 percent of all drivers stopped at suspicionless checkpoints were charged with DUI whereas the same charge was lodged against *7.69* percent of all drivers stopped by roving patrols (seven versus *seventy-seven* DUI arrests per 1000 stops). The majority attempts to explain this disparity away by calling the statistics "misleading" in that "it is expected that a higher percentage of stopped vehicles will lead to arrests in the roving patrol scenario" due to the fact that "every vehicle that passes through a roadblock is stopped, at least briefly, and a roving patrol only stops an automobile exhibiting signs of impaired driving." Op. at 587. However, in my view, the black and white statistical evidence is in no way "misleading" as it unequivocally affirms that roving patrols are more effective than checkpoints and in fact, it is precisely *because* roving patrols target those who have exhibited some sign of impaired driving that they are the more effective tool for catching drunk drivers.

The other empirical data before this Court for the above-referenced time period shows that the total number of man-power-hours per arrest for suspicionless checkpoints was 28.77 whereas only 18.82 manpower-hours were required for each DUI arrest stemming from roving patrols. Again, the majority tries to explain away this considerable imbalance, this time saying that the manpower-hours per arrest statistic does not "tell the whole story" because checkpoints are likely to reduce drunk driving through deterrence. Op. at 588. According to the majority, this deterrence stems from the fact that checkpoints are highly visible and are required to be advertised in advance, thereby giving drivers an opportunity to use alternative transportation. However, as noted above, the reality is that many people, rather than undergoing the inconvenience of finding alternative transportation, will drive after drinking and then simply avoid the advertised checkpoint location or, if they

somehow did not get word of the pre-determined location, will attempt to turn around once they realize that a checkpoint is stationed ahead. As I stated in my dissent in *Yastrop,* "to effectively deter drunk drivers, the obvious remedy is to catch more drunk drivers by utilizing routine police patrols and roving DUI patrols, rather than using one pre-determined and pre-announced location." *Id.* at 329.[1]

Finally, the majority attempts to dilute the power of the statistics which, in effect, prove Appellant's contention that roving patrols are far more effective than suspicionless checkpoints in stopping drunk driving by stating that the judiciary is in a poor position to make judgments concerning which law enforcement tools are the most effective. However, this Court cannot and should not ignore the cold hard facts before us. Contrary to what the majority suggests, we do not need to make judgments here because the statistics do it for us. The statistics Appellant has presented to the Court *prove* that roving patrols are more efficient and effective than DUI checkpoints. They show that checkpoints require more manpower-hours for each DUI arrest than do roving patrols and they show that a lower percentage of stops at checkpoints lead to DUI arrests than do stops stemming from roving patrols. In the end, the statistics tell the simple tale that if more police manpower had been allocated to roving patrols instead of checkpoints, more drunk drivers would have been removed from the roads and our roads would have been safer places to travel.

In the face of these statistics, I simply cannot agree with the majority that Appellant has not proven the ineffectiveness and hence, the unconstitutionality of suspicionless checkpoints. The bottom line here is that checkpoints are not the least

1. I do, however, agree with the majority that the statistics presented by Appellant do not, in one sense, "tell the whole story." Indeed, the statistics, while clearly proving the relative ineffectiveness of suspicionless checkpoints, do not in any way account for the substantial intrusion that those checkpoints impose on the lives of law-abiding motorists, who must often wait in the backlog of traffic caused by the checkpoints even before enduring the actual stop by police once they reach the checkpoint.

intrusive or, as the statistics on this record leave no doubt about, the most effective means of catching and deterring drunk drivers. They should be deemed unconstitutional.

Justice BAER joins this dissenting opinion.