COMMONWEALTH of Pennsylvania,
Appellee,

v.

Connie Lee MICKLEY, Appellant.

Superior Court of Pennsylvania.

Argued Sept. 23, 2003.

Filed March 25, 2004.

Karl E. Rominger, Carlisle, for appellant.

Jaime M. Keating, Asst. Dist. Atty., Carlisle, for Com., appellee.

BEFORE: HUDOCK and KLEIN, JJ. and McEWEN, P.J.E.

OPINION BY HUDOCK, J.:

¶ 1 This is an appeal from the judgment of sentence entered after Appellant was convicted by a judge sitting without a jury of two counts of driving under the influence of alcohol and one count of careless driving.[1] For the reasons that follow, we affirm.

¶ 2 The trial court ably summarized the facts and procedural history as follows:

Trooper John Yunk of the Pennsylvania State Police encountered [Appellant's] vehicle at approximately 2:56 a.m. on the morning of November 4, 2001. [Appellant] was traveling south on [S]tate Route 34. The trooper was traveling directly behind her. His attention was drawn to her vehicle because she was weaving from side to side within her own lane of travel.

As they approached the intersection with [S]tate Route 174, [Appellant] crossed the fog line onto the berm of the road. The berm is approximately three feet wide and is paved. Her entire rear wheel crossed over the line. While she was still on the paved portion of the berm, she was "well over" the fog line. During the next three-quarters of a mile, she crossed the fog line three more times. Each crossing was similar to the first[,] i.e., her entire rear wheel was over the fog line onto the paved berm. It is also noteworthy that the crossings occurred on a relatively straight stretch of road.

Route 34 is a two lane highway. [Appellant] and the trooper encountered several vehicles traveling in the opposite direction. Two of the fog lane crossings were in response to that vehicular traffic. The officer testified that in his training and experience this is an "indicator for driving under the influence." In any event, after she crossed the fog line for the fourth time, the officer initiated a traffic stop in order to issue a citation for violation of Section 3309(1) of the Vehicle Code. [Trooper Yunk followed Appellant for a distance of approximately seven miles before effectuating the traffic stop.]

As the officer approached [Appellant's] vehicle, he noted the classic indicia of intoxication. There was a strong odor of alcohol, her speech was slurred, and she had a bloodshot and glassy eye. [Appellant has an unspecified problem with her other eye that did not allow the trooper to make a reliable observation of it.] The officer asked her to get out of

1.  75 Pa.C.S.A. §§ 3731(a)(1) and (a)(4), and 3309(1), respectively.

the vehicle. When she did, he noticed that the strong odor of alcohol was coming from her breath. As she was standing outside the vehicle, she also had a very difficult time finding her documents. While she was looking for the documents, the officer asked her whether she had been drinking. She responded that she had consumed four beers.

After having failed the field sobriety tests, [Appellant] was placed under arrest and transported to the central booking center. Before her processing began, she was advised that her words and actions were being recorded. Additionally, the booking center contains five prominently displayed signs advising all occupants that audio and visual recording is taking place. [The video camera was pointed out to her at the time her processing began.]

[Appellant] was advised of her *O'Connell* warnings [*Dep't. of Transportation v. O'Connell*, 521 Pa. 242, 555 A.2d 873 (1989)] and she agreed to submit to a breath test. The booking center personnel explained the operation of the Intoxilyzer 5000. During the first test, she did not blow any air into the instrument. As a result, the machine timed out and shut down. It printed out a test ticket indicating "invalid test." Trooper [Y]unk advised [Appellant] that she could submit to a blood test, or have her failure to provide breath be considered a refusal. [He again advised her of the *O'Connell* warnings]. [Appellant] indicated that she would like to try the Intoxilyzer again. The trooper agreed.

During the next test, [Appellant] gave one valid sample before the machine shut down, printing a test ticket that stated "invalid test—inhibited RFI." This was a result of a radio transmission in the vicinity.

While the machine was being reset, [Appellant] was talking to the booking officer with her mouth in close proximity to the mouthpiece. Not only was she talking, she was also coughing. The machine aborted its pretest routine, printing out a ticket that stated "invalid test/ambient conditions." We are satisfied that the machine picked up alcohol from [Appellant's] breath and shut itself down. The machine was restarted and a valid breath test was eventually obtained. The entire time elapsing between the first attempted test and the final successful test was only eleven (11) minutes.

Trial Court Opinion, 10/1/02, at 1–4 (citations and footnotes omitted).

¶ 3 The final successful test result revealed that Appellant had a blood alcohol content of 0.147, an amount in excess of the legal limit. Appellant was subsequently convicted of driving under the influence and was sentenced to pay the costs of prosecution, a fine of $310.00 and to undergo a period of incarceration of not less than forty-eight hours nor more than twenty-three months, with immediate parole at the expiration of the minimum sentence. This appeal followed. The trial court ordered Appellant to file a statement of matters complained of on appeal, pursuant to Rule 1925(b), and Appellant complied. The trial court then filed an opinion in response, pursuant to Rule 1925(a).

¶ 4 Appellant raises two questions for our review:

I. SINCE THE TROOPER LACKED PROBABLE CAUSE TO INITIATE A TRAFFIC STOP OF [APPELLANT] ON THE EVENING IN QUESTION, SHOULD ALL OF THE EVIDENCE OBTAINED AS A RESULT OF THAT STOP HAVE BEEN SUPPRESSED?

II[.] DID THE TRIAL COURT ERR BY FAILING TO SUPPRESS OR EXCLUDE THE BREATH RESULTS?

Appellant's Brief at 6.

■ ¶ 5 With regard to the first issue presented, Appellant argues that the trooper lacked probable cause to stop her vehicle because crossing the fog line is not a violation of the Vehicle Code, and there was no indication that her movement over the fog line was made unsafely. Appellant contends that giving an oncoming vehicle additional room to pass is permissible under the Vehicle Code, is consistent with safe driving and that her maneuvers were purposeful. Appellant argues that the stop was illegal and that all evidence gleaned from the stop should be suppressed, including the results of her breathalyzer test.

¶ 6 Our standard of review when addressing a challenge to a trial court's denial of suppression is whether the factual findings are supported by the record and whether the legal conclusions drawn from these facts are correct. *Commonwealth v. Hawkins*, 549 Pa. 352, 377, 701 A.2d 492, 504–05 (1997). When reviewing the rulings of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. *Id.* Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Id.*

■ ¶ 7 In order for a traffic stop to be justified, a police officer must have probable cause to believe that a violation of the Vehicle Code or regulations has taken place. *Commonwealth v. Battaglia*, 802 A.2d 652, 656 (Pa.Super.2002). The officer must be able to articulate specific facts possessed by him at the time of the questioned stop, which would provide probable cause to believe that the vehicle or the driver was in some violation of some provision of the Vehicle Code. *Id.* Probable cause does not require certainty, but rather exists when criminality is one reasonable inference, not necessarily even the most likely inference. *Commonwealth v. Stroud*, 699 A.2d 1305, 1308 (Pa.Super.1997). In considering when a traffic stop is justified, the Pennsylvania Supreme Court has stated that:

> The Commonwealth has an interest in enacting and enforcing rules and regulations for the safety of those who travel its highways and roads. The police should thus be permitted a sufficient degree of latitude to stop automobiles in order to meet this objective. On the other side, the privacy interest of the individual has been cogently articulated by the United States Supreme Court:
>
> An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use is subject to government regulation. Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. *Delaware v. Prouse*, 440 U.S. 648, 662, 99 S.Ct. 1391, 1400–1401, 59 L.Ed.2d 660, 673 (1979) (footnote omitted).

> When previously faced with these two competing interests, we held "that a stop of a single vehicle is unreasonable where there is no outward sign the vehi-

cle or the operator are in violation of the Vehicle Code[.] [B]efore the government may single out one automobile to stop, there must be specific facts justifying this intrusion."

*Commonwealth v. Whitmyer,* 542 Pa. 545, 551–52, 668 A.2d 1113, 1116–17 (1995) (some citations omitted). The legislature has vested police officers with the authority to stop vehicles whenever they have "reasonable and articulable grounds to suspect a violation of the Vehicle Code." 75 Pa.C.S.A. § 6308(b).[2] The statutory standard of "articulable and reasonable grounds" is the same as "probable cause." *Battaglia,* 802 A.2d at 665.

¶ 8 In the instant case, as noted by the trial court, "[t]he [Appellant] had driven erratically for seven miles. She was weaving frequently within her lane for the first six miles. She crossed the fog line four times over the last three quarters of a mile. Two of the crossings were in response to oncoming traffic, a clear indicator of driving under the influence." Trial Court Opinion, 10/1/02, at 5–6 (citation omitted). Applying the above standard to the facts of the instant case, we agree with the trial court's conclusion that the initial stop of Appellant's vehicle was proper.

¶ 9 Appellant relies on *Commonwealth v. Gleason,* 567 Pa. 111, 785 A.2d 983 (2001), to support her argument that the stop of her vehicle was unjustified. In *Gleason,* our Supreme Court found that there was not probable cause to stop the defendant after the officer observed the defendant's crossing of a berm line on two or three occasions over the distance of a quarter of a mile on a four-lane deserted roadway. In the instant case, the trial

court fully acknowledged and distinguished *Gleason.* As the trial court points out, Appellant's erratic driving occurred on a two lane highway with opposing traffic, rather than on a four-lane deserted highway, and "posed a clear hazard to herself and the motoring public." Trial Court Opinion, 10/1/02, at 6. In addition, two of the crossings were made in response to oncoming traffic. Trooper Yunk testified that, in his experience, such crossings are an indicator that a driver may be under the influence of alcohol. N.T., 5/30/02, at 33–34. Thus, we find that the trial court did not err when it determined that, at the time of the initial stop of Appellant's vehicle, Trooper Yunk had reasonable and articulable grounds to suspect a violation of the Vehicle Code sufficient to satisfy Pennsylvania law. *See also Commonwealth v. Slonaker,* 795 A.2d 397 (Pa.Super.2002) (explaining that probable cause for a traffic stop exists when a trooper followed Appellant's vehicle for five miles and observed the vehicle fully cross the white fog line three times and weave numerous times over the double yellow center line and the white fog line without fully crossing either line).

¶ 10 Appellant's second argument is that the trial court erred when it allowed the Commonwealth to introduce the results of her Intoxilyzer test. Appellant contends that her test results should have been suppressed on the grounds that the Intoxilyzer 5000 unit malfunctioned. *See* Appellant's Brief at 13. She claims that the Intoxilyzer test was administered in violation of 67 Pa.Code section 77.25, which requires the operator of breath test equipment to remove the machine from service

---

**2.** The legislature approved changes to the statutory language of 75 Pa.C.S.A section 6308(b) on September 30, 2003. The amended provision now reads as follows: "**(b) authority of police officer.**—Whenever a police

officer is engaged in a systematic program of checking vehicles or drivers or has a reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle…" 75 Pa.C.S.A. § 6308(b).

following a malfunction. The suppression court refused to grant Appellant's request for relief on the grounds that there was no malfunction and that the machine performed exactly as it was designed to do. We agree.

 ¶ 11 "Malfunctioning" has been interpreted by our Court to mean "failing to perform on accuracy and calibration tests required to be performed as set forth in Sections 77.24(b) (accuracy inspection test) or during an actual breath test as set forth in 77.25(b) (actual test), and not otherwise." *Commonwealth v. Hoopes*, 722 A.2d 172, 176 (Pa.Super.1998) (citations omitted). Our Court has determined that a breath testing machine needs to be placed out of service and re-calibrated only if it failed or malfunctioned during a calibration inspection test, during an actual test of a suspect, or if the simulation test exceeded the prescribed deviation during a calibration test. *Id.* None of these events occurred in this case.

¶ 12 As noted by the suppression court in its opinion, the Intoxilyzer test was administered to Appellant four times. The first attempt failed because Appellant did not provide any breath to be tested. The machine 'timed out' correctly. The second aborted test involved the machine shutting down because of radio frequency interference. The machine shut down because the Intoxilyzer has a feature which causes the machine to abort testing when radio frequency interference occurs. This feature also performed according to the machine's design. The third aborted test occurred when the machine picked up alcohol on Appellant's breath during its pre-test internal checks. This third aborted test happened because Appellant talked and coughed in close proximity to the Intoxilyzer's sensor. The machine picked up alcohol on Appellant's breath while performing its pre-test internal checks. A

design feature of the equipment resulted in automated shut-down. During the fourth administration of the test, a breath sample was successfully obtained. The machine did not fail to perform on accuracy and calibration tests or during an actual breath test, thus, no malfunction of the machine occurred. *Hoopes, supra.* For the foregoing reasons, we find that the suppression court did not abuse its discretion when it denied Appellant's motion to suppress the results of the Intoxilyzer 5000 test.

¶ 13 Judgment of sentence affirmed.