**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Kenneth SANDS, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 14, 2005.
Filed Nov. 2, 2005.

Dawson R. Muth, West Chester, for appellant.

Nicholas J. Casenta, Asst. Dist. Atty., West Chester, for Com., appellee.

Before: MUSMANNO, BENDER and OLSZEWSKI, JJ.

BENDER, J.:

¶ 1 Kenneth Sands (Appellant) appeals from the judgment of sentence entered following his convictions for driving under the influence of alcohol and for violating the vehicle code provision requiring that a vehicle be driven in a single lane. *See* 75 Pa.C.S. §§ 3802(a)(1)(c), 3309(1). Appellant raises several allegations of error, all of which we find to be without merit. Accordingly, we affirm.

¶ 2 The trial court made the following findings of fact:

1. At approximately 12:15 a.m. on August 25, 2004, arresting Westtown East Goshen police officer, Peter Keegan ("Officer Keegan"), was driving his marked police vehicle, while on duty and in full uniform, east in the right lane of Route 3, a/k/a West Chester Pike, within East Goshen Township, Chester County, Pennsylvania. At that time, Officer Keegan had been a police officer for approximately four and one-half years and had made between forty and fifty driving under the influence arrests.

2. Route 3 within East Goshen Township, Chester County, Pennsylvania, is a four-lane divided highway. Two lanes are provided for eastbound traffic and two lanes are provided for westbound vehicles. The right-hand eastbound lane in which Officer Keegan was proceeding is approximately ten to eleven feet wide with a clearly visible solid white fog line marking the lane's right (south) side boundary. The left and right eastbound lanes of Route 3 in this vicinity were separated by a clearly visible dotted white line. To the right of

the aforementioned fog line is an approximately six foot wide paved shoulder berm ("berm").

3. As Officer Keegan approached the 1300 block of Route 3, he observed the Defendant's car approximately fifty feet in front of him proceeding within the speed limit, eastbound in the right lane. There were no cars between Officer Keegan's vehicle and the Defendant's car. Officer Keegan's attention was drawn to the Defendant's vehicle due to its unsteady, weaving progress.

4. Although Route 3 is a relatively straight highway in the vicinity where Officer Keegan first observed the Defendant's vehicle, the Defendant's car appeared unable to stay in its lane. As Officer Keegan made his first observations, the Defendant's car slowly drifted to the fog line and across it approximately three feet until it slowly drifted back into the right lane.

5. While Officer Keegan continued to follow the Defendant's vehicle, he observed the car, for a second time, slowly drift to the fog line and across it, intruding approximately three to four feet onto the berm before slowly drifting back across the fog line and into the right lane.

6. As Officer Keegan continued to follow the Defendant's vehicle toward the intersection of Route 3 and Westtown Way, an intersection located approximately one-quarter mile from the area where Officer Keegan first observed the Defendant's vehicle, for a third time, the Defendant's vehicle slowly drifted out of the right eastbound lane and across the fog line, again extending approximately three feet into the berm before slowly drifting back into the right lane. Route 3 in this vicinity gently curves left and downhill toward Westtown Way.

7. Between the 1300 block of Route 3 and the Westtown Way–Route 3 intersection, on August 25, 2004, Route 3 was well lit with street lights and there were no obstructions or debris on the Route 3 eastbound lanes or berm to explain the weaving motion of Defendant's vehicle. Adjacent to the eastbound berm on its right edge, in the vicinity where Officer Keegan observed the Defendant's vehicle, is occasional curbing. To the right of the eastbound berm and off the cart way in this vicinity are some structures and improvements, including parking lots, road signs, bus stops and a power source generator.

8. The above-described power source generator consists of a large green box located approximately three feet from the edge of the berm. A utility pole is located next to the generator. Officer Keegan observed that the Defendant's vehicle came within approximately six feet of the power source generator as it weaved for the third time onto the Route 3 berm.

9. Officer Keegan was concerned about the Defendant's safety, and thought that the Defendant's inability to maintain a straight trajectory within the right lane of travel on Route 3, and his weaving onto the eastbound berm, indicated that he might strike one of the stationary objects located along Route 3. He was especially concerned that the Defendant's vehicle would strike the power source generator or the adjacent utility pole. The weaving Officer Keegan observed on Route 3 led him to suspect that the Defendant was driving under the influence of alcohol.

10. While Officer Keegan observed the Defendant's car on Route 3, he did not observe any pedestrians or other motor vehicles in the vicinity of the Defendant's vehicle.

11. When the Defendant's vehicle arrived at the intersection of Route 3 and Westtown Way, it made a right turn onto Westtown Way, proceeding through the green traffic signal.

12. After turning onto Westtown Way and traveling approximately two hundred feet, Defendant's vehicle, out of the sight of Officer Keegan, turned left onto Walnut Hill Road. Shortly after traveling on Walnut Hill Road, the Defendant's vehicle turned left onto Manley Road.

13. A short distance after following the Defendant's car on Manley Road, Officer Keegan initiated the traffic stop of the Defendant's car on Manley Road in the vicinity of School Lane in East Goshen Township.

14. Conditions during Officer Keegan's observation of the Defendant's vehicle were dry and none of the relevant road surfaces were wet.

Trial Court Opinion (T.C.O.), 12/23/04, at 1–4.

¶ 3 Furthermore, the record shows that after Officer Keegan stopped Appellant's vehicle and approached Appellant, Officer Keegan detected a strong odor of alcohol. N.T., 10/20/04, at 5. Appellant also had slurred speech and blood shot eyes, and he failed all the field sobriety tests administered by Officer Keegan. *Id.* at 6. Appellant also failed a breathalyzer test, and a subsequent blood alcohol test showed an alcohol content of .18. *Id.* at 7. Based on the foregoing, the Commonwealth charged Appellant with the aforementioned offenses.

¶ 4 Prior to trial, Appellant filed a motion to suppress based on a claim that the traffic stop was illegal. The court denied the motion and following a non-jury trial, the court found Appellant guilty as charged. This was Appellant's second DUI offense, and the court sentenced Appellant to thirty days' incarceration, one year of probation, eighty hours of community service and alcohol assessment and treatment. Appellant then filed this appeal raising the following six questions for our review:

I. Whether the trial court erred in holding that probable cause was not required at the time that the police officer stopped the defendant's vehicle?

II. Whether the trial court erred in its application of Section 6308 of the Vehicle Code, wherein the standard necessary for a vehicle stop was lowered from Probable Cause to Reasonable Suspicion?

III. Whether the trial court's application and interpretation of 6308 of the Vehicle Code as applied to the facts and circumstances of this case is unconstitutional under the State and Federal Constitutions?

IV. Whether the trial court erred in denying the suppression of all evidence acquired by the Commonwealth following the stop of the defendant's vehicle?

V. Whether the trial court erred in finding that reasonable suspicion was present at the time the police officer stopped the defendant?

VI. Whether the trial court erred in its findings of fact and conclusions of law that the weaving alleged in this case is "excessive," "pronounced", and "exaggerated" so as to support an investigative detention?

Brief for Appellant at 4.

¶ 5 Although Appellant has presented six questions for our review, he has grouped his Argument into only two sections; the first section addresses questions one through three, and the second section addresses questions three through six. We admonish Appellant's counsel for not adhering to the Pennsylvania Rules of Ap-

pellate Procedure, which simply require that the Argument section be "divided into as many parts as there are questions to be argued." Pa.R.A.P. 2119(a). And upon review of Appellant's Argument, the issues can be restated as: (1) Whether 75 Pa.C.S. § 6308(b), which permits a police officer to stop a vehicle based upon reasonable suspicion that the driver is in violation of the Vehicle Code, 75 Pa.C.S. §§ 101–9802, is unconstitutional as applied to the facts of this case; and (2) If Section 6308(b) is constitutional, whether Officer Keegan had reasonable suspicion to stop Appellant's vehicle based upon a suspicion that Appellant was driving under the influence?

¶ 6 In the instant case, Appellant has presented a constitutional challenge under both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.[1] "When reviewing the constitutionality of a statute, we begin with the strong presumption that legislative enactments do not violate the constitution. Thus, the challenger of the Act bears a heavy burden of proving that the statute clearly, palpably and plainly violates constitutional rights." *Commonwealth v. Bullock*, 868 A.2d 516, 521 (Pa.Super.2005) (citation and quotation marks omitted). "Constitutionality of a statute is a question of law, therefore the scope of our review of this issue is plenary." *Commonwealth v. Moss*, 852 A.2d 374, 379 (Pa.Super.2004).

¶ 7 The statute at issue here is Section 6308(b), which states:

**(b) Authority of police officer.—** Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has *reasonable suspicion* that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S. § 6308(b) (emphasis added). The Pennsylvania Legislature recently amended Section 6308(b). In its previous form, the statute required the officer to have "articulable and reasonable grounds to suspect a violation." 75 Pa.C.S. § 6308(b) (1998), *amended by* 75 Pa.C.S. § 6308(b) (2004).

¶ 8 In *Commonwealth v. Whitmyer*, 542 Pa. 545, 668 A.2d 1113 (1995), our Supreme Court considered the Commonwealth's claim that the "articulable and reasonable grounds" standard contained in the *former* Section 6308(b) was equivalent to a reasonable suspicion standard. The court rejected this argument, finding it to be one of semantics, and held that the "articulable and reasonable grounds" standard was

1. The Fourth Amendment to the United States Constitution states:

The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Article I, Section 8 of the Pennsylvania Constitution states:

**§ 8. Security from searches and seizures**
The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.
Pa. Const., art. I, § 8.

equal to a probable cause standard. *See id.* at 1116.

¶ 9 In *Whitmyer*, the defendant was stopped for a suspected violation of 75 Pa.C.S. § 3361, which prohibits driving at an unsafe speed. The only legal basis for the state trooper to stop the defendant was the fact that he made an erratic lane change. Prior to trial, the defendant filed a motion to suppress evidence found subsequent to the stop that showed that he was smoking marijuana. The trial court granted the motion, and on appeal, this Court affirmed that decision. *See Commonwealth v. Whitmyer*, 415 Pa.Super. 393, 609 A.2d 809 (1992), *overruled by Commonwealth v. McElroy*, 428 Pa.Super. 69, 630 A.2d 35, 41 (1993) (en banc).

¶ 10 In determining the meaning of the "articulable and reasonable grounds" standard, our Supreme Court balanced the underlying interests of the individual and the government:

[I]t is necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen, for there is no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.

*Whitmyer*, 668 A.2d at 1115 (quoting *Terry v. Ohio*, 392 U.S. 1, 20–21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) (further citation omitted). The court also identified these sometimes competing interests. In regard to the government's interest, the court stated, "The Commonwealth has an interest in enacting and enforcing rules and regulations for the safety of those who travel its highways and roads. The police should thus be permitted a sufficient degree of latitude to stop automobiles in order to meet this objective." *Id.* And as regards the individual's interest, the court

quoted the United States Supreme Court, when it stated:

An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation. Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel.

*Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 662, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)).

¶ 11 The court also cited *Commonwealth v. Swanger*, 453 Pa. 107, 307 A.2d 875 (1973), a case where it had previously struck a balance between these two interests. In *Swanger*, the court held that "a stop of a single vehicle is unreasonable where there is no outward sign the vehicle or the operator are in violation of the Motor Vehicle Code.... We rule before the government may single out one automobile to stop, there must be specific facts justifying this intrusion." *Id.* at 878. Following this precedent, the court, in *Whitmyer*, concluded that the trooper had "no justifiable basis for stopping" the defendant. *Whitmyer*, 668 A.2d at 1117.

¶ 12 In particular, the *Whitmyer* court reasoned that "there was no outward sign that [the defendant] was driving at an unsafe speed." *Id.* Although the trooper had witnessed the driver perform an erratic lane change, such driving "does not fit within the ambit of prohibited vehicle operation as defined in section 3361." *Id.*

Most importantly, the court noted that "this is not a case where further investigation would lead to a discovery of a violation of the Vehicle Code" because "there is no further evidence that could be obtained from a subsequent stop and investigation" which "would warrant a citation for driving at an unsafe speed." *Id.* at 1118.

¶ 13 *Whitmyer* spawned a progeny of cases that dealt with an officer's authority to stop a vehicle pursuant to the prior version of 75 Pa.C.S. § 6308(b). *See Commonwealth v. Gleason,* 567 Pa. 111, 785 A.2d 983, 985 (2001); *Commonwealth v. Wituszynski,* 567 Pa. 49, 784 A.2d 1284 (2001); *Commonwealth v. Cook,* 865 A.2d 869 (Pa.Super.2004); *Commonwealth v. Butler,* 856 A.2d 131 (Pa.Super.2004). All of these cases involved factual scenarios where the police officer stopped a vehicle for a suspected violation of the Vehicle Code other than DUI, such as failure to drive within a single lane, 75 Pa.C.S. § 3309, or unsafely overtaking a vehicle on the right, 75 Pa.C.S. § 3304. However, in each case, the driver was ultimately charged with DUI.

¶ 14 All these cases reaffirm the court's holding in *Whitmyer* that the police must have probable cause to stop a vehicle for a suspected violation of the Vehicle Code. In each case, the defendant litigated a motion to suppress based upon an alleged lack of probable cause. These motions met a varying degree of success.

¶ 15 As stated above, in 2004, our legislature amended Section 6308(b) and an excerpt from the Legislative Journal demonstrates the legislature's intent in amending the statute so as to authorize police officers to stop a vehicle based upon a "reasonable suspicion" that the driver has violated the Vehicle Code.

Truthfully, our experience with DUI offenders and accidents have taught us a lot. For one thing, deaths caused by drunk drivers have declined nationally, but in Pennsylvania they continue to rise. We have learned that more than half of all fatal alcohol-related accidents are caused by hardcore drunken drivers, those people whose BACs are .16 or above. They are often repeat offenders.

In the next 2 weeks in Pennsylvania, whether we are here in session or not, 13 people will die as a result of accidents where alcohol was a factor. Those 13 people might include your neighbor, a favorite uncle, the minister at your church, a brother, a sister, a son, a daughter, a spouse. There is no doubt that the results of accidents caused by drinking and driving are tragic and the effects last for the lifetime of the survivors.

. . .

Mr. Speaker, I would like to address the portion of this bill that amends section 6308 of the Vehicle Code. The topic at issue here deals with the authority of police officers to stop a vehicle in order to enforce the Vehicle Code. Pennsylvania courts have recently discarded the reasonable suspicion justification for making traffic stops in DUI cases. The Pennsylvania courts are now requiring a stricter probable cause standard to justify these stops. As evidenced by *Com. v. Gleason,* 567 Pa. 111, 785 A.2d 983 (2001), broad stricter limits on police authority to make these stops are permitting drunk drivers to evade accountability. Evidence of their drunkenness is being suppressed and their convictions overturned. While drunk drivers and their attorneys benefit from the elimination of the reasonable suspicion justification, this development in the Pennsylvania criminal law is cause for great concern among not only police and prosecutors but among law-abiding citizens as well, and the issue requires once

again the action of the General Assembly.

Mr. Speaker, this issue is much larger than simply counting how many times a drunk driver crosses lines on the road. *Gleason* has created an untenable double standard for justifying traffic stops in Pennsylvania. Pennsylvania courts now require probable cause to make a traffic stop based on a Vehicle Code offense while reasonable suspicion is sufficient for other traffic stops. This dichotomy is particularly dangerous considering some of the serious offenses that fall under the Vehicle Code, including homicide by vehicle, homicide while DUI, aggravated assault while DUI, and accidents involving death or personal injury, and of course, DUI itself.

. . .

Nonetheless, the *Gleason* court rejected this view and created an untenable double standard. According to *Gleason*, § 6308(b) imposes a higher standard of justification for making traffic stops in Pennsylvania based on Vehicle Code violations than is constitutionally required for other traffic stops. And yet, the language of § 6308(b) ("articulable and reasonable grounds to suspect") is virtually the same as the constitutional standard set forth by [*Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)] ("articulable and reasonable suspicion").

. . .

Finally, Mr. Speaker, in the bill currently under consideration, we have used the phrase "reasonable suspicion" which satisfies the requirements of the United States Constitution and the Pennsylvania Constitution and accurately balances the dangers of drunken driv-

ing with the right of any citizen to be secure in his person.

Legislative Journal–House, July 8, 2003 at 1444–45 (Comments of Representative Harper).

¶ 16 Clearly, the legislature's intent was to permit officers who suspect that an operator of a vehicle has committed a serious offense, such as DUI or homicide by vehicle, to stop the vehicle based upon a reasonable suspicion rather than the heightened standard of probable cause. And the legislature reasoned that such an amendment would be constitutional since existing constitutional precedent actually permits police officers to stop a vehicle based upon reasonable suspicion that criminal activity is afoot. *See Commonwealth v. Murray*, 460 Pa. 53, 331 A.2d 414, 418 (1975). In the case before us, we are now asked to rule on whether the statute is unconstitutional as applied to facts where a driver has been subjected to a vehicular stop based upon a reasonable suspicion that he is driving under the influence.[2]

■ ¶ 17 It is often stated that under both federal and state constitutional jurisprudence, there are three types of recognized interactions between a law-enforcement officer and a citizen.

A primary purpose of both the Fourth Amendment and Article I, Section 8 is to protect citizens from unreasonable searches and seizures. Not every encounter between citizens and the police is so intrusive as to amount to a "seizure" triggering constitutional concerns. *See Commonwealth v. Boswell*, 554 Pa. 275, 721 A.2d 336, 340 (1998) (opinion in support of affirmance) (citing *Terry v. Ohio*, 392 U.S. 1, 20 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). This Court has

---

**2.** We shall not address the issue of whether Officer Keegan in fact possessed reasonable suspicion to stop Appellant until after we con-

clude our analysis on the constitutionality of the statute.

noted that there are three basic categories of interactions between citizens and the police. The first category, a mere encounter or request for information, does not need to be supported by any level of suspicion, and does not carry any official compulsion to stop or respond. The second category, an investigative detention, derives from *Terry* and its progeny: such a detention is lawful if supported by reasonable suspicion because, although it subjects a suspect to a stop and a period of detention, it does not involve such coercive conditions as to constitute the functional equivalent of an arrest. The final category, the arrest or custodial detention, must be supported by probable cause.

*Commonwealth v. Hill,* 874 A.2d 1214, 1217 (Pa.Super.2005) (citations and quotation marks omitted).

■ ¶ 18 In *Murray,* our Supreme Court held that in order for the police to stop the driver or occupants of a vehicle for suspected criminal activity, the officer must possess reasonable suspicion that criminal activity is afoot. *See Murray,* 331 A.2d at 418. The court reasoned as follows:

The United States Supreme Court in *Terry, supra* and in Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), has suggested that even in the absence of probable cause there may be, under certain circumstances, justification for a limited intrusion upon the privacy of an individual. Under these decisions the Court has suggested that a brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining additional information may in fact be reasonable although the officer at that time did not possess probable cause that would justify an arrest. In the *Terry, supra* and *Adams, supra*

decisions, the Court was required to struggle with the balancing of the right of society and the right of an individual in street encounters. **Because a motorist's extreme mobility may otherwise allow him to avoid police confrontation, the State has an equally strong interest in these cases in stopping a moving vehicle to freeze momentarily a situation of suspected criminality.** However, these decisions have made it clear that to justify the intrusion the police officer must be able to point to specific and articulable facts which taken together with rational inferences from those facts reasonably warranted the intrusion. See Adams v. United States, *supra;* Terry v. Ohio, *supra.* **Thus, it is also clear that an investigative stop of a moving vehicle to be valid must be based upon objective facts creating a reasonable suspicion that the detained motorist is presently involved in criminal activity.**

*Id.* (emphasis added) (citation omitted). Since our Supreme Court decided *Murray* in 1975, it has remained the law of this Commonwealth that a police officer may stop a vehicle if he or she has reasonable suspicion to believe that the occupants were involved in criminal activity. *See Commonwealth v. Smith,* 454 Pa.Super. 489, 685 A.2d 1030, 1033 (1996); *Commonwealth v. Wells,* 441 Pa.Super. 272, 657 A.2d 507 (1995).

¶ 19 The Commonwealth argues that the reasonable suspicion standard is appropriate where an officer suspects a driver of DUI, and that an investigatory stop is the most efficacious way for an officer to investigate the suspicion. Indeed, there is a line of cases in which this Court has considered whether an officer legally stopped a vehicle based upon a reasonable suspicion that the driver was driving under the influence. *See Commonwealth v. Krisko,*

2005 PA Super 320, 884 A.2d 296 (2005); *Commonwealth v. Lana,* 832 A.2d 527 (Pa.Super.2003); *Commonwealth v. Swartz,* 787 A.2d 1021 (Pa.Super.2001) (en banc); *Commonwealth v. Lohr,* 715 A.2d 459 (Pa.Super.1998); *Commonwealth v. Janiak,* 368 Pa.Super. 626, 534 A.2d 833 (1987). In *Krisko; Lohr* and *Janiak,* we concluded that the officer possessed reasonable suspicion to stop the vehicle, however, we did so absent any consideration of the officer's authority to stop the vehicle pursuant to Section 6308. Similarly, in *Swartz* and *Lana,* we concluded that the officer did not possess sufficient information to form a reasonable suspicion that the driver was committing a DUI violation, and we did so without any reference to the officer's authority under Section 6308.

¶ 20 Thus, prior to the amendment of Section 6308(b), and currently, the courts of this Commonwealth have treated vehicular stops on different bases depending on the nature of the suspected violation of the Vehicle Code. In those cases mentioned in the preceding paragraph involving a suspected DUI violation, the issue was whether the officer possessed reasonable suspicion to stop the vehicle. However, in those cases where the suspected violation is one such as a failure to drive within a single lane or unsafely overtaking a vehicle on the right, discussed *supra,* the courts require that the officer possess probable cause to believe that there has been a violation of the Vehicle Code. We must now reconcile the foregoing law with the amended Section 6308(b) in addressing Appellant's claim that the statute is unconstitutional as applied to the facts of this case because it permits officers to stop vehicles based upon a reasonable suspicion of a violation of the Vehicle Code rather than probable cause.

¶ 21 We note that our decision here is limited to the constitutionality of Section 6308(b) in so far as it permits an officer to stop a vehicle based upon a reasonable suspicion that the driver is operating the vehicle under the influence of alcohol. Thus, we are not here addressing whether the statute comports with federal and state constitutional protections discussed in cases such as *Gleason* or *Whitmyer* where the suspected violation was not DUI.

¶ 22 Whereas our Supreme Court identified *Whitmyer* as a case where further investigation would not lead to a discovery of a violation of the Vehicle Code because there was no further evidence that could be obtained from a subsequent stop and investigation that would warrant a citation for driving at an unsafe speed, *see Whitmyer,* 668 A.2d at 1118, a suspected violation for DUI is in fact a scenario where further investigation almost invariably leads to the most incriminating type of evidence, *i.e.,* strong odor of alcohol, slurred speech, and blood shot eyes. This type of evidence can only be obtained by a stop and investigation.

¶ 23 In contrast, it is hard to imagine that an officer following a vehicle whose driver is suspected of driving at an unsafe speed would discover anything further from a stop and investigation. Similarly, if an officer who observes a driver run a red light or drive the wrong way on a one-way street, the officer either does or does not have probable cause to believe there has been a violation of the Vehicle Code. A subsequent stop of the vehicle is not likely to yield any more evidence to aid in the officer's determination.

¶ 24 In *Commonwealth v. Beaman,* 583 Pa. 636, 880 A.2d 578 (2005), a case involving a constitutional challenge to police sobriety checkpoints, our Supreme Court recognized that a search may be reasonable absent even reasonable suspicion under certain circumstances.

The existence of individual suspicion, however, is not an "irreducible" component of reasonableness in every circumstance. Rather, where regimes of suspicionless searches or seizures are designed to serve governmental "special needs" that exceed the normal demands of law enforcement, they will be upheld in certain instances.

. . .

Because of the severe consequences of drunken driving in terms of roadway deaths, injuries, and property damage, both the United States Supreme Court and this Court have recognized that the government has a compelling interest in detecting intoxicated drivers and removing them from the roads before they cause injury. This has raised the question of whether the law permits police officers to effect suspicionless seizures in the form of brief vehicle stops at publicly announced sobriety checkpoints along roadways known to be frequented by intoxicated drivers. As noted, and as with all similar questions, this question has been answered with reference to the balancing test described above.

As to the Fourth Amendment, the United States Supreme Court has determined that DUI roadblocks constitute a reasonable means of advancing the vital public interest in reducing drunk driving deaths and injuries, and that they only involve a modest intrusion on the privacy and liberty of motorists. Accordingly, the Court has found that suspicionless stops at such roadblocks are constitutionally reasonable. The question remains, however, whether the greater individual privacy protections afforded by Article I, Section 8 of the Pennsylvania Constitution compel a different result.

. . .

[B]ased on the record in front of us, we find that the trial court properly concluded that Appellant failed to show that DUI roadblocks are so ineffective that they must be declared constitutionally unreasonable.

*Id.* at 583–589 (citations omitted). Thus, *Beaman* echoes the concern of Representative Harper that the Commonwealth has a compelling and vital interest in reducing drunken driving. Furthermore, the court's statement that the Commonwealth's needs in reducing drunk driving exceed the normal demands of law enforcement, and therefore, "regimes of suspicionless searches or seizures" are valid under certain circumstances, indicates that a balancing test must take into account the efficacy or efficiency of certain law enforcement methods in apprehending drunk drivers. *Id.*

¶ 25 The other side of this balancing test is the cumulative privacy interest of the citizens of our Commonwealth to be secure in their persons, effects and privacy and free from unreasonable searches. Indeed, this is an interest that this Court vigilantly seeks to safeguard and we shall not "give the police absolute, unreviewable discretion and authority to intrude into an individual's life for no cause whatsoever." *Swanger*, 307 A.2d at 878. However, "the law of search and seizure is constantly evolving, [and] its focus remains on the delicate balance of protecting the right of citizens to be free from unreasonable searches and seizures and protecting the safety of our citizens and police officers by allowing police to make limited intrusions on citizens while investigating crime." *Commonwealth v. Blair*, 860 A.2d 567, 573 (Pa.Super.2004).

¶ 26 We hold that the limited intrusion permitted by Section 6308(b) in the case of a vehicular stop based upon a reasonable suspicion that the driver is driving under

the influence, as balanced against the Commonwealth's salutary interest in preventing DUI violations, violates neither the Fourth Amendment nor Article I, Section 8. In such cases, the officer must be able to relay specific and articulable facts that would give rise to a reasonable suspicion that the person is driving under the influence, and we conclude that this requirement is sufficient to ensure that the police do not infringe upon the citizens' rights to be free from unreasonable searches and seizures.

¶ 27 Turning to the facts of this case, Officer Keegan was on patrol during the early morning hours when he observed Appellant at 12:15 a.m. Officer Keegan witnessed Appellant drift across a clearly visible fog line three times. Each time, Appellant would cross over the fog line by approximately three feet and then slowly drift back. This occurred on a portion of road without any sharp curves or obstructions to explain the weaving.

¶ 28 Furthermore, in determining whether Officer Keegan possessed reasonable suspicion, we must accord due weight "to the specific reasonable inferences [he] is entitled to draw from the facts in light of his experience." *Commonwealth v. Rogers,* 578 Pa. 127, 849 A.2d 1185, 1189 (2004) (quotation marks omitted). Officer Keegan had made between forty and fifty driving under the influence arrests at the time that he stopped Appellant. In light of his experience and his specific articulable observations, we conclude that Officer Keegan possessed reasonable suspicion that Appellant was driving under the influence. Accordingly, the stop was legal and the trial court correctly denied Appellant's motion to suppress.

¶ 29 Judgment of Sentence **AFFIRMED.**

¶ 30 Judge OLSZEWSKI files a concurring opinion.

OLSZEWSKI, J., concurring:

¶ 1 The majority has provided a well researched and thorough analysis of this matter. I write separately to express my own reasons and concerns in reaching the conclusion to affirm the trial court's sentence.

¶ 2 In *Commonwealth v. Whitmyer,* 542 Pa. 545, 668 A.2d 1113 (1995), our Supreme Court addressed the difference between the standard articulated in prior court decisions (probable cause to believe that there has been a violation of the vehicle code) and the language of the applicable statute (articulable and reasonable grounds to suspect a violation of the vehicle code), holding that "the two standards amount to nothing more than a distinction without a difference." The Court also noted that they had previously held that "a stop of a single vehicle is unreasonable where there is no outward sign the vehicle or the operator are in violation of the vehicle code ... before the government may single out one automobile to stop, there must be specific facts justifying this intrusion;" and that the legislature has vested police officers "with the authority to stop vehicles whenever they have articulable and reasonable grounds to suspect a violation of the vehicle code." *Whitmyer,* 668 A.2d. at 1116–1117.

¶ 3 Here, I would affirm the trial court on the basis of the previously delineated standard. As the majority noted, in light of Officer Keegan's experience and his specific observations of appellant's driving, the officer had a justifiable basis for stopping appellant. I cannot assent to a standard which fails to require outward signs of a violation of the motor vehicle code or articulable and reasonable grounds to suspect a violation of the code (whether requiring further investigation by police or

not). Because I believe the *Whitmyer* standard controls this matter, the majority appears to uphold this spirit, and the facts of this case support the outcome, I therefore concur in the conclusion that the trial court judgment should be affirmed.