## Commonwealth v. Yeckley

*David Kaltenbuagh, district attorney's office,* for Commonwealth.
*Arthur T. McQuillen,* for defendant.

DiFRANCESCO, *J.,* December 29, 2005—

## RULE 1925 STATEMENT

*Factual Summary*

William D. Yeckley (defendant) was arrested on the evening of April 17, 2005, in Hastings, Cambria County, Pennsylvania by Chief Ronald Sharkey Sr. (officer) of the Hastings Borough Police Department for being in actual physical control of the movement of a vehicle after allegedly imbibing alcohol, and charged with violating 75 Pa.C.S. §§3802(a)(1) and 3802(c) as well as the summary offenses of careless driving and driving on the right side of the roadway.

The defendant waived his charges to the Cambria County Court at his preliminary hearing on May 24, 2005. The affidavit of probable cause as well as police incident reports stated that the officer received a complaint from an unidentified third party about an alleged intoxi-

cated person leaving the Moose Lodge on 4th Avenue in Hastings. Upon following the defendant's vehicle on the night of the incident, the officer arrested the defendant, obtained a blood alcohol level (BAC) and charged the defendant with driving after imbibing.

On October 12, 2005, the defendant filed a motion to suppress evidence, contending in part that the officer had an insufficient independent basis to reasonably conclude that the defendant had been operating the motor vehicle and the physical result of the blood test must be suppressed. The Commonwealth vigorously opposed the defendant's contentions.

After considering legal arguments and testimony of the officer, this court granted the defendant's motion to suppress said evidence. The Commonwealth subsequently filed a timely appeal on the ruling.

## Discussion

The Pennsylvania Constitution provides:

"The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant." Article I, Section 8.

The Fourth Amendment of the United States Constitution aptly provides:

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or af-

firmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Constitution Amendment 4.

Under both federal and state provisions, people are to be secure in their persons against "unreasonable searches and seizures." As such, the issue in this matter is whether the officer had probable cause or was reasonable in his arrest of the defendant for allegedly driving after imbibing. Such arrests trigger the state and federal protections against "unreasonable searches and seizures."

The Supreme Court of the United States has made it clear the Fourth Amendment protects people wherever the individual may harbor a reasonable expectation of privacy. See *Commonwealth v. Swanger,* 453 Pa. 107, 110, 307 A.2d 875, 877 (1973), referencing *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Once it is established the individual is within an area where he or she has a reasonable expectation of privacy, he or she is entitled to be free from unreasonable intrusions by the government. See *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

An automobile is a place where an individual has a reasonable expectation of privacy. Cf. *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Commonwealth v. Linde,* 448 Pa. 230, 293 A.2d 62 (1972); *Commonwealth v. Shaffer,* 447 Pa. 91, 288 A.2d 727 (1972). Moreover, when a police officer stops a vehicle, he or she has "seized" the vehicle and its occupants, and thus, the protections of the Fourth Amendment must be considered. Cf. *Terry v. Ohio, supra; Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20

L.Ed.2d 917 (1968); *Commonwealth v. Pollard,* 450 Pa. 138, 299 A.2d 233 (1973).

The defining decision on police searches into the privacy of individuals in the context of the Fourth Amendment is *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In writing this very eloquent decision, Chief Justice Warren wrote:

"And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the mere detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard; would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in his belief' that the action taken was appropriate? Cf. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Beck v. State of Ohio,* 379 U.S. 89, 96-97, 85 S.Ct. 223, 229, 13 L.Ed.2d 142 (1964). Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this court has consistently refused to sanction. See *e.g., Beck v. Ohio, supra; Rios v. United States,* 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). And simple 'good faith on the part of the arresting officer is not enough.' If subjective good faith alone

were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, and papers and effects,' only in the discretion of the police. *Beck v. Ohio, supra,* (379 U.S.) at 97, 85 S.Ct. at 229." *Terry v. Ohio,* 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 896 (1968).

Keeping *Terry* in mind, the Pennsylvania Supreme Court held that before the police may make *even one single automobile stop,* there must be specific facts to justify this intrusion. Specifically, the police officer must have *probable cause* based on specific facts, which indicate to he or she that, either the vehicle or the driver are in violation of the Motor Vehicle Code. *Commonwealth v. Swanger,* 453 Pa. 107, 115, 307 A.2d 875, 879 (1973).

Justice Clark has described probable cause as occurring where the facts and circumstances within the officer's knowledge and of which he or she has trustworthy information are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed. *Berger v. New York,* 388 U.S. 41, 55, 87 S.Ct. 1873, 1881-82, 18 L.Ed.2d 1040, 1050 (1967).

If a stop is made without probable cause, then the trial court *must suppress* such evidence obtained from that unconstitutional stop. The reason for suppressing evidence is to deter improper police conduct. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Thus, every police officer is required to know that he or she cannot search *without probable cause.* If he or she nevertheless searches on mere suspicion, the court will ignore his argument that the result of the search justified the suspicion. *Ker v. California,* 374 U.S. 23, 40, n.12, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *United States v.*

*Di Re,* 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948); *Commonwealth v. DeMichel,* 442 Pa. 553, 277 A.2d 159 (1971). To accept the argument would encourage another officer to do what he or she knew he or she should not do, in the hope that his or her illegal conduct would likewise be excused by its result. *Commonwealth v. Mayer,* 240 Pa. Super. 181, 362 A.2d 407 (1976).

Finally, in a more contemporaneous decision, the Pennsylvania Supreme Court has provided the following guidance for the evaluation of police-citizen interactions:

"Initially we note that Fourth Amendment jurisprudence has led to the development of three categories of interactions between citizens and the police. The first of these is a 'mere encounter' (or request for information), which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. . . . The second, an 'investigative detention' must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. . . . Finally, an arrest or 'custodial detention' must be supported by probable cause." *Commonwealth v. Ellis,* 541 Pa. 285, 293-94, 662 A.2d 1043, 1047 (1995); *Commonwealth v. Reid,* 571 Pa. 1, 7-8, 811 A.2d 530, 544-45 (2002). See also, *Commonwealth v. Hill,* 874 A.2d 1214, 1217 (Pa. Super. 2005).

With these constitutional protections in mind regarding a traffic stop, the Pennsylvania Supreme Court has provided the following guidance:

"If the alleged basis of a vehicular stop is to permit a determination whether there has been compliance with the Motor Vehicle Code of this Commonwealth, it is in-

cumbent [sic] upon the officer to articulate specific facts possessed by him, at the time of the questioned stop, which would provide probable cause to believe that the vehicle or the driver was in violation of some provision of the Code." *Commonwealth v. Whitmyer,* 542 Pa. 545, 550, 668 A.2d 1113, 1116 (1995) (quoting *Commonwealth v. Murray,* 460 Pa. 53, 58-59, 331 A.2d 414, 416-17 (1975)).

In *Commonwealth v. Gleason,* 567 Pa. 111, 785 A.2d 983 (2001), the Supreme Court reaffirmed the holding in *Whitmyer* that a police officer must have probable cause to believe that a driver has violated a provision of the Motor Vehicle Code in order to justify a traffic stop of the vehicle. *Gleason,* 567 Pa. at 122, 785 A.2d at 989. Moreover, where the police initiate a traffic stop based on a safety hazard allegedly created by the driver, the police must possess "specific facts justifying [the] intrusion." *Id.* at 121, 785 A.2d at 988. "Probable cause does not require certainty, but rather exists when criminality is one reasonable inference, not necessarily even the most likely inference." *Commonwealth v. Mickley,* 846 A.2d 686, 689 (Pa. Super. 2004), *appeal denied,* 580 Pa. 705, 860 A.2d 489 (2004). This view was reinforced by the Superior Court in *Commonwealth v. Snell,* 811 A.2d 581 (Pa. Super. 2002), which held that "[w]hile an actual violation of the [Motor Vehicle Code] need not ultimately be established to validate a vehicle stop, a police officer must have a reasonable and articulable belief that a vehicle or driver is in violation of the [Motor Vehicle Code] in order to lawfully stop the vehicle." *Id.* at 584.

Despite the constitutional protections afforded by *Terry* and its progeny, this court is also mindful but troubled by recent decisions of the Superior Court, in particular

the decision in *Commonwealth v. Sands,* 887 A.2d 261 (Pa. Super. 2005) which in essence has begun an erosion of the Fourth Amendment protections against unreasonable search and seizures as they pertain to suspected violations of the Motor Vehicle Code. In *Sands,* the Superior Court lessened the probable cause requirement needed for police officers to effectuate the stop of a motorist suspected of driving while after imbibing. Writing for the *Sands* court, Justice Bender wrote:

"We hold that the limited intrusion permitted by section 6308(b) in the case of a vehicular stop based upon a reasonable suspicion that the driver is driving under the influence, as balanced against the Commonwealth's salutary interest in preventing DUI violations, violates neither the Fourth Amendment nor Article I, Section 8. In such cases, the officer must be able to relay *specific and articulable* facts that would give rise to a reasonable suspicion that the person is driving under the influence, and we conclude that this requirement is sufficient to ensure that the police do not infringe upon the citizens' rights to be free from unreasonable searches and seizures." *Sands,* 887 A.2d at 271-72.

In the appearance of the eroding of constitutional rights of our Commonwealth's citizens, *Sands* based its decision mostly in part to a speech given by a State Representative on the floor of the Pennsylvania General Assembly who blasted our distinguished Superior Court's decision in *Gleason,* by saying in part that the decision enabled "drunk drivers and their attorneys [to] benefit from the elimination of the reasonable suspicion justification, this development in the Pennsylvania criminal law is cause for great concern among not only police and prosecutors but among law-abiding citizens as well,

and the issue requires once again the action of the General Assembly." *Id.* at 267-68, quoting *Legislative Journal-House,* July 8, 2003 at 1444-45. (Comments of Representative Harper.)

It is very troubling that *Sands* would choose to erode the constitutional rights of our Commonwealth's citizens primarily based on the emotions of a zealous State Representative who appears to have no concept of the Fourth Amendment protections against illegal "searches and seizures" and clearly has a bias against the courageous criminal defense lawyers who uphold the rights of our Commonwealth's citizens. To be influenced by such inflammatory political rhetoric is so reminiscent of the dark days of early 1930s Germany when the National Socialist Party gradually took hold of the Reichstag and gradually chiseled away at the rights of German citizens, and the courts, the last bastion of personal liberty, did *nothing.*

The judiciary must never be influenced by public opinion, polls, protests, misguided media, emotions, or the political whims of the legislative branch. The judiciary, and in particular this court, shall only be guided by the law.

This court recognizes the dangers of motorists who choose to drive after imbibing, but this court also recognizes that all citizens have constitutional protections under the Fourth Amendment of the United States Constitution. In fact, this court is mindful of the many vices of society which need to be vigorously prosecuted—but not at the expense of the Constitution and individual liberties. The irrational basis of *Sands* could easily be used to justify the elimination of search warrants to expedite

the searching of suspect's homes or to justify the search of an individual on the street who looks suspicious.

To some, individual's *Miranda* rights consume too much time in the course of an arrest. Such an attitude is inexcusable in our society. This court is mindful of the words of Samuel Adams, an American patriot who defended accused British soldiers before the Revolution:

"The liberties of our country, the freedom of our civil Constitution, are worth defending at all hazards; and it is our duty to defend them against all attacks. We have received them as a fair inheritance from our worthy ancestors: they purchased them for us with toil and danger and expense of treasure and blood, and transmitted them to us with care and diligence. It will bring an everlasting mark of infamy on the present generation, enlightened as it is, if we should suffer them to be wrestled from us by violence without a struggle, or to be cheated out of them by the artifices of false and designing men."

In the present matter, the court notes that the officer observed the defendant for less than half of the .36 miles that the defendant traveled. Further, the officer testified that he arrived on the scene as a result of a "report of two guys getting in a vehicle that was highly intoxicated in front of the Moose which is located on Fourth Avenue which at the time I entered the police car and proceeded toward Fourth Avenue from the office." See page 4 of Suppression Hearing transcript, dated October 25, 2005.

The court notes that the officer presented no description of the vehicle as a result of this alleged anonymous tip.

The officer then noted that when he arrived at Fourth Avenue, he did not find the pickup truck being described,

so "I proceeded to Third Avenue at which time I spotted a pickup truck that was traveling south on Third Avenue." *Id.* at 5. The officer then followed the pickup truck, when he noticed it "was actually riding against the curb" on the "right hand side." *Id.* Specifically, the officer said the pickup truck's "wheel was against the curb." *Id.* The officer then testified that the pickup truck "came to the stop sign at Third and Kirkpatrick. He stopped at the stop sign, made a right turn onto Kirkpatrick at which time he made a right turn, it was a wide right turn so he was actually in the opposite lane of traffic. He traveled about a half a block on the wrong side of the roadway at which time I activated the red and blue lights on the police car and [the defendant] stopped at the intersection of Kirkpatrick and Haida." *Id.* at 5-6.

On cross-examination, the officer testified that he stopped the defendant's vehicle based on his own observations, and he also acknowledged that he did not see the defendant's vehicle parked in front of the Moose. *Id.* at 9. The officer then testified that he saw the defendant's vehicle as it was already halfway down Third Avenue, and he further acknowledged that the entire distance from the Moose till the actual stop was three tenths of a mile. *Id.* at 12-13. All told, the officer noted that he observed the vehicle for a total of three minutes. *Id.* at 21. Next, the officer acknowledged that the defendant properly stopped his vehicle at Third and Kirkpatrick and properly *used his turn signal. Id.*

When asked by the Commonwealth why he pulled the defendant over, the officer responded, "the purpose was driving against the curb and also driving on the wrong side of the road." *Id.* Upon pulling the defendant over, the officer then administered a series of field sobriety

tests as a result of his smelling of alcohol. The defendant was unable to pass the tests, and was subsequently placed under arrest and transported to the local hospital for a chemical blood test, which showed a blood alcohol content of .144. The officer then charged the defendant with driving after imbibing. *Id.* at 7-8.

Regarding Kirkpatrick Street, the officer acknowledged that said street did not have any lines or markings, nor a center solid yellow line nor any fog lines or lines defining the width of the roadway. *Id.* at 14-15. Lastly, the officer agreed that the said road was narrow. *Id.* When asked on cross why he pulled the defendant over, the officer stated that it was "not a turning violation, [but for a] traffic violation for driving down the wrong side of the roadway." *Id.* When told there was no middle line, the officer responded, "he drove to the left of the roadway when there was sufficient width to drive to the right." *Id.*

When asked about the defendant's car and its relationship to the curb on Third Avenue, the officer noted that the vehicle "didn't strike it; he drove up against it." *Id.* at 18. Further, the officer stated that he did not activate his flashers at that point, because he "was waiting to see if there were other infractions." *Id.* To the officer, the defining infraction by the defendant was the wide turn. *Id.* After which, the officer decided to stop the defendant's vehicle.

In reviewing the officer's testimony and the record, the court does not find the officer's testimony to be credible. At best, the officer had the opportunity to view the defendant's vehicle for .18 of a mile as he so testified, and the court notes that this total travel distance amounts

to about 45 seconds as provided by defendant's exhibit 1. In applying the scaled down standard of individual protections of *Sands,* the court notes that the officer has failed to provide any *specific and articulable facts* to warrant this arrest other than witnessing the defendant's vehicle make a wide turn and ride too close to the road's curb. Such statements fail to meet the rather low standard set forth in *Sands* to effectuate this arrest.

In fact, the court further notes that the officer testified that the reason for pulling the defendant's vehicle over was "driving against the curb and also driving on the wrong side of the road." Hence, since the grounds for stopping the said vehicle was not driving after imbibing, but rather standard violations of the Motor Vehicle Code, "probable cause" is now the standard to effectuate a traffic stop as enunciated by *Gleason* and its progeny. Accordingly, the officer acknowledged that the road in question was narrow and there were no markings, and at best, the officer observed the vehicle for .18 of a mile for at best 45 seconds. Such facts fail to constitute the probable cause needed by an officer to effectuate a traffic stop for mere violations of the Motor Vehicle Code.

Lastly, it is readily apparent to this court that whether applying the probable cause standard or the standard applied from *Sands,* the officer's decision to pull the defendant's vehicle over was based upon illusion as a result of an unsubstantiated, anonymous tip. If it were not for the said telephone call, the officer would have had absolutely no reason to pull the vehicle over and effectuate an eventual arrest.

In summary, the officer, by applying both the weak constitutional protections in *Sands* to effectuate a traffic stop for driving after imbibing and the probable cause

requirement for suspected violations of the Motor Vehicle Code, has failed to meet either standard. As such, the evidence of the defendant's arrest must be suppressed and his constitutional protections against illegal "searches and seizures" per the state and federal constitutions preserved.